UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

JUL 18 2014

Clerk, U.S. District and
Bankruptcy Courts

SALIL DUDANI,
15 Fair Elms
Laguna Niguel, CA 92677,

               **PLAINTIFF**

vs.

DISTRICT OF COLUMBIA,
1350 Pennsylvania Ave., NW
Suite 316
Washington, DC 20004,

RONALD BURGESON,
*Master Patrol Officer,*
*in his individual capacity,*
Metropolitan Police Department
Sixth District
100 42nd St., NE
Washington, DC 20019,

GARY L. FITZGERALD,
*Lieutenant,*
*in his individual capacity,*
Metropolitan Police Department
Sixth District
100 42nd St., NE
Washington, DC 20019,

JOHN KELLMAN,
*Officer,*
*in his individual capacity,*
Metropolitan Police Department
Sixth District
100 42nd St., NE
Washington, DC 20019,

FRANTZ FULCHER,
*Officer,*
*in his individual capacity,*
Metropolitan Police Department
Sixth District
100 42nd St., NE

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Judge _____
Civil Action No. _____

**JURY TRIAL DEMANDED**

Case: 1:14-cv-01209
Assigned To : Leon, Richard J.
Assign. Date : 7/18/2014
Description: General Civil

RECEIVED

1

Washington, DC 20019,                    )
                                         )
AARON SMITH,                             )
*Officer*,                               )
*in his individual capacity*,            )
Metropolitan Police Department           )
Sixth District                           )
100 42nd St., NE                         )
Washington, DC 20019,                    )
                                         )
JOHN DOE 1,                              )
*in his individual capacity*,            )
Metropolitan Police Department           )
Sixth District                           )
100 42nd St., NE                         )
Washington, DC 20019,                    )
                                         )
JOHN DOE 2,                              )
*Lieutenant,*                            )
*in his individual capacity*,            )
Metropolitan Police Department           )
Sixth District                           )
100 42nd St., NE                         )
Washington, DC 20019,                    )
                                         )
            DEFENDANTS                    )
                                         )
                                         )
_____

## COMPLAINT

### THE PARTIES

1.    Plaintiff Salil Dudani is a citizen of California.

2.    Defendant District of Columbia is a municipal corporation. The

Metropolitan Police Department (MPD) is an agency of Defendant District of Columbia.

3.    Defendant Master Patrol Officer Ronald Burgeson ("MPO Burgeson") is

and was, at all times relevant to this Complaint, an MPD officer. MPO Burgeson is being

sued in his individual capacity.  At all times relevant to this Complaint, MPO Burgeson was acting under color of District law within the scope of his employment with the District of Columbia.

4.      Defendant Lieutenant Gary L. Fitzgerald ("Lt. Fitzgerald") is and was, at all times relevant to this Complaint, an MPD Lieutenant.  Lt. Fitzgerald is being sued in his individual capacity.  At all times relevant to this Complaint, Lt. Fitzgerald was acting under color of District law within the scope of his employment with the District of Columbia.

5.      Defendant Officer John Kellman ("Ofc. Kellman") is and was, at all times relevant to this Complaint, an MPD officer.  Ofc. Kellman is being sued in his individual capacity.  At all times relevant to this Complaint, Ofc. Kellman was acting under color of District law within the scope of his employment with the District of Columbia.

6.      Defendant Officer Frantz Fulcher ("Ofc. Fulcher") is and was, at all times relevant to this Complaint, an MPD officer.  Ofc. Fulcher is being sued in his individual capacity.  At all times relevant to this Complaint, Ofc. Fulcher was acting under color of District law within the scope of his employment with the District of Columbia.

7.      Defendant Aaron Smith ("Ofc. Smith") is and was, at all times relevant to this Complaint, an MPD Officer.  Ofc. Smith is being sued in his individual capacity.  At all times relevant to this Complaint, Ofc. Smith was acting under color of District law within the scope of his employment with the District of Columbia.

8.      Defendant John Doe 1 is and was, at all times relevant to this Complaint, an MPD officer.  John Doe 1 is being sued in his individual capacity.  At all times relevant to this Complaint, John Doe 1 was acting under color of District law within the scope of his employment with the District of Columbia.

9.    Defendant John Doe 2 is and was, at all times relevant to this Complaint, an MPD Lieutenant.  Lt. John Doe 2 is being sued in his individual capacity.  At all times relevant to this Complaint, Lt. John Doe 2 was acting under color of District law within the scope of his employment with the District of Columbia.  Lt. John Doe 2 was the watch commander at 6D at the time of the events described in this Complaint.

## JURISDICTION AND VENUE

10.    This action arises under 42 USC § 1981, 42 USC § 1983, Title VI of the Civil Rights Act, and the District of Columbia common law.

11.    This Court has jurisdiction over the parties and subject matter pursuant to 28 USC §§ 1331 and 1367(a).

12.    Venue is proper in this district pursuant to 28 USC § 1391(b)(2) because the events or omissions giving rise to this action occurred in the District of Columbia.

## STATEMENT OF FACTS

### Introduction

13.    In this civil rights lawsuit, Plaintiff Salil Dudani seeks to hold accountable the District of Columbia and its employees for their tortious and unconstitutional acts.

14.    As part of his work at the District of Columbia Public Defender Service (PDS), Mr. Dudani was attempting to interview police officers at the Metropolitan Police Department's Sixth District.  Although Mr. Dudani was not doing anything unusual or suspicious, he was treated as if he was a terrorist by officers at the station who perceived him to be Middle Eastern. (Mr. Dudani is actually of Indian descent.)  Without any legitimate law enforcement justification, Mr. Dudani was detained and his backpack was

seized and searched for explosives; he was frisked; one officer used his personal cellphone to take a picture of Mr. Dudani after he was ordered to spread his legs; Mr. Dudani was detained a second time; detectives attempted to interrogate Mr. Dudani; and a false and defamatory Suspicious Activity Report was created about Mr. Dudani.

15.     An internal review of the officers' actions justified their behavior by noting Mr. Dudani's race and imagining that he "could have possibly been involved in some sort of terrorist activity." The report of the internal review contained false and defamatory statements impugning Mr. Dudani's professionalism and suggesting he engages in criminal activity.

16.     The incident did not involve an isolated incident of misconduct by a single officer. Supervisors reviewing the report of the internal review agreed that all of the officers acted consistently with MPD policy, including the use of Mr. Dudani's perceived race or nationality in determining whether he was engaging in terrorism or other criminal activity.

17.     The incident was recorded on video by the District of Columbia, but in violation of an order from the Superior Court and a subpoena from PDS, the video was destroyed, depriving Mr. Dudani of important evidence for this case.

**The Incident**

18.     During the summer of 2013, Plaintiff Salil Dudani was an intern for the District of Columbia's Public Defender Service ("PDS").

19.     Around 2:20 p.m. on August 7, 2013, Mr. Dudani went to the Metropolitan Police Department's 6th District station ("6D") to attempt to interview several police officers in connection with his work at PDS.

9.     Mr. Dudani parked his car on Ames St., NE, several hundred feet away from the 6D police station.

20.     Through previous conversations with the MPD, Mr. Dudani knew that the officers he intended to interview finished their shifts that day at 2:00 pm. Mr. Dudani noticed several officers leaving the station's parking lot with duffel bags and asked them if their shifts were ending. The officers confirmed their shifts were ending and one officer told Mr. Dudani that the shifts of the officers he sought to speak with were also ending. This same officer told Mr. Dudani that the officers he wanted to speak with were still inside the station and would exit soon. Mr. Dudani did not enter the police station and instead waited for them outside.

21.     For several minutes, Mr. Dudani approached officers leaving the station parking lot, but none were the officers Mr. Dudani sought to interview. One officer told Mr. Dudani that officers ending their shift leave from the back of the station and motioned to a door on the far side of the station's parking lot. The officer suggested that Mr. Dudani speak to officers as they used this door.

22.     At approximately 2:30 pm, Mr. Dudani saw a group of officers exit the station and stand in a semicircle by the door. Mr. Dudani walked across 42nd St. and entered the right side of the parking lot. The officers were directly in front of Mr. Dudani as he walked through the parking lot. There were several other officers in the parking lot as Mr. Dudani walked toward the group of officers by the door. When Mr. Dudani was a few feet from the door, one of the officers asked Mr. Dudani what he needed.

23.     Mr. Dudani told the officers he was there to interview police officers. The officers at the door told Mr. Dudani that they work the night shift, while the officers Mr. Dudani wanted to speak with worked the day shift. The officers asked Mr. Dudani, "Why do you want to speak with them?" Mr. Dudani replied, "I want to ask them about an incident." One of the officers asked, "Why don't you just ask us?" Mr. Dudani answered, "Because they are related to the incident." Mr. Dudani then thanked the officers, turned

around, and walked through the parking lot, walking next to the station. As Mr. Dudani walked away he heard the officers remark that they thought he was a process server there to serve papers on the officers he had asked about. The officers then raised their voices and called out to Mr. Dudani, "You're a process server." One of the officers yelled, "You're a process server, be loud and proud about it." Mr. Dudani did not respond.

24.     When Mr. Dudani had walked through most of the parking lot, MPO Burgeson stopped him next to a white, marked police car parked in the lot.

25.     Mr. Dudani was wearing a black backpack containing folders related to his work with PDS, and an iPad.

26.     MPO Burgeson told Mr. Dudani to put his hands on the police car. Mr. Dudani turned and put his hands on the car. The police officers standing by the back exit approached MPO Burgeson and Mr. Dudani. MPO Burgeson asked for Mr. Dudani's identification. Mr. Dudani asked MPO Burgeson, "Which one, my government ID or my work ID?" Officer Burgeson told Mr. Dudani to show either ID. Mr. Dudani took out his wallet and gave MPO Burgeson his driver's license. The officer asked Mr. Dudani for his last name, and Mr. Dudani said, "Dudani." MPO Burgeson asked Mr. Dudani his date of birth and Mr. Dudani replied by accurately stating his date of birth.  The officer took down Mr. Dudani's phone number.

27.     Without asking for permission, John Doe 1 took and searched Mr. Dudani's backpack. One of the officers asked Mr. Dudani if he had any weapons on him or in his backpack. Mr. Dudani said, "No." MPO Burgeson said, "Spread your legs so I can pat you down for weapons," and Mr. Dudani spread his legs. MPO Burgeson said, "Further," and Mr. Dudani spread his legs further.  MPO Burgeson again said, "Further," and Mr. Dudani again spread his legs further. MPO Burgeson patted down Mr. Dudani and squeezed Mr. Dudani's front right pants pocket. Mr. Dudani said, "My keys." The

officers were communicating on their radios and continued to do so throughout the incident. Mr. Dudani heard someone over the radio offer reinforcements to the officers. An officer replied negatively and said that "sufficient units" were present.

28.     As already stated, the group of officers Mr. Dudani was originally talking to had come over and joined MPO Burgeson and Mr. Dudani. Then, approximately ten other officers congregated to the right of Mr. Dudani, the group, and John Doe 1

29.     An officer in a vest holding a large black machine gun stood in front and to the right of Mr. Dudani. Mr. Dudani heard the officers read a special license plate of a car parked in front of the parking lot and speculate that "he" might be with someone important.

30.     One of the officers told Mr. Dudani that he should not have entered the station's parking lot. This officer said, "Don't you see the sirens outside? We're on heightened alert. This is happening all over the country." The officer told Mr. Dudani that there had been a shooting at a Fairfax police station. The officer asked, "Did you know that?" Mr. Dudani said, "No." As the officers discussed the possibility of an attack on the station, one of the officers looked at Mr. Dudani and said, "There'll just be the red mist," and then laughed. Mr. Dudani heard an officer state and spell his (Mr. Dudani's) name into the officer's radio. The officer described Mr. Dudani as Middle Eastern and mentioned his backpack into the radio several times.

31.     The officers asked Mr. Dudani why he was in the parking lot and Mr. Dudani again said he was there on behalf of PDS and wanted to speak with a particular group of officers. An officer asked to see Mr. Dudani's work ID and Mr. Dudani presented his PDS ID card to the officer. Mr. Dudani told the officers that he spoke with an officer leaving the station and the officer suggested Mr. Dudani check the back exit. An officer said, "I would hope one of our guys would know better than that."

32.    Mr. Dudani asked the officers why they stopped him and an officer replied, "We're following our policies, we don't need to explain why we do what we do." The officer that searched Mr. Dudani's backpack then told MPO Burgeson that there was nothing in Mr. Dudani's backpack.

33.    Several minutes passed while officers throughout the parking lot were looking at Mr. Dudani spread on the police car. These officers were laughing and smiling. One officer took out a black cell phone and took a picture of Mr. Dudani spread on the car.

34.    A superior officer, Sgt. Prater, came out the back exit of the station and approached the group. Sgt. Prater asked Mr. Dudani what he was doing in the parking lot. Mr. Dudani repeated that he was there to interview certain police officers on behalf of PDS. Sgt. Prater told Mr. Dudani that the officers he was looking for were not in the station and that Mr. Dudani should use the front entrance to the station. Sgt. Prater then walked away.

35.    Mr. Dudani asked if he could stand normally and the officers replied, "No. We're running your information."

36.    A few minutes later, the officers allowed Mr. Dudani to get off the police car and most of the officers left. MPO Burgeson told Mr. Dudani that he was now going to take a report and told Mr. Dudani it would be a SARS report for suspicious activity. Mr. Dudani asked MPO Burgeson, "Will there be a 251?" MPO Burgeson said, "Yes, that's what this is for." MPO Burgeson took out a small white pad and asked Mr. Dudani for his California ID. Mr. Dudani gave MPO Burgeson his wallet, and MPO Burgeson again asked Mr. Dudani for his date of birth and took down Mr. Dudani's cell phone number.

37.    MPO Burgeson was writing information down on the hood of the car where Mr. Dudani was detained, and an officer was standing to MPO Burgeson's right. Mr. Dudani asked, "Officer Burgeson?" MPO Burgeson replied, "I'll give you my information later." After a few moments Mr. Dudani said, "Officer Burgeson, I have a question. Why did you stop me when I was walking away?" MPO Burgeson said, "We were just told the protocol." MPO Burgeson told Mr. Dudani that there were new policies regarding suspicious activities near police stations. MPO Burgeson told Mr. Dudani, "To be honest, I didn't catch it, but when you were walking away, someone said, did we ever ask him for ID?" Mr. Dudani asked MPO Burgeson why one of the officers took pictures of him. Mr. Dudani told MPO Burgeson the number on the helmet of the officer taking pictures. MPO Burgeson said, "The pictures must have been for the report." Mr. Dudani asked, "For the 251?" MPO Burgeson said, "Yes, the pictures were for the report."

38.    MPO Burgeson again asked Mr. Dudani what had happened and Mr. Dudani repeated that he was there to interview officers. MPO Burgeson wrote down the officers' names. MPO Burgeson asked Mr. Dudani what he wanted to interview them about. Mr. Dudani said, "Related to a case." MPO Burgeson asked which case, or CCN number, was connected to the investigation. Mr. Dudani asked, "Is this for the report?" MPO Burgeson said, "Yes." Mr. Dudani told MPO Burgeson that it was for work related to the Public Defender Service. MPO Burgeson said, "Okay," and wrote "Public Defender Service" on his pad. MPO Burgeson asked Mr. Dudani for PDS's phone number and Mr. Dudani replied, "I can't remember off the top of my head, but I can Google it." MPO Burgeson said, "That's fine."

39.    MPO Burgeson said, "I saw you say 'no' when I said Middle Eastern earlier.  I said you were of Middle Eastern descent. I didn't mean to offend you." Mr. Dudani said, "I'm Indian."

40.    MPO Burgeson ripped off a white piece of paper with his badge number, the phone number of 6D, and Mr. Dudani's CCN number, and gave it to Mr. Dudani. MPO Burgeson offered to take Mr. Dudani to the front desk at the police station and Mr. Dudani declined saying, "No, since they [the officers Mr. Dudani wanted to speak with] are off shift now anyway." MPO Burgeson offered a few more times to take Mr. Dudani to the front desk. MPO Burgeson said, "Now there won't be any trouble, you're with me." Mr. Dudani said, "Ok. It would be great if I could get an appointment with the officers I wanted to speak with." MPO Burgeson said, "I'm not on this shift so I don't know. I know on my shift you normally can't make an appointment. I'll just talk to the shift supervisor."

41.    Mr. Dudani and MPO Burgeson entered the police station through the front door. Mr. Dudani approached a female he had spoken with on previous occasions. MPO Burgeson told Mr. Dudani, "You know what, you just take a seat and I'll explain what's going on." Mr. Dudani thanked MPO Burgeson and sat down in the police station as MPO Burgeson walked behind the desk, out of sight.

42.    A few moments later, Sgt. Prater came to the desk and asked Mr. Dudani if he had a subpoena for the officers he wanted to interview. Mr. Dudani said, "No, I'm just hoping to interview them." Mr. Dudani asked if it would be possible to make an appointment with the officers, and Sgt. Prater said, "I talked to Sgt. Skelton and he says you'll need a subpoena to talk to them." Mr. Dudani asked, "So if I subpoena them, then I can speak with them before the court date?" Sgt. Prater said, "Yes." Mr. Dudani asked, "So you talked to Sgt. Skelton?" Sgt. Prater said, "Yes." Mr. Dudani asked, "Did you call the officers just now, or are any of the officers back there?" Sgt. Prater said, "No, I just talked to Sgt. Skelton." Mr. Dudani said, "I don't understand whose decision it was that they won't talk to me." Sgt. Prater said, "I didn't make the decision, I just talked to Sgt.

Skelton and [Skelton] said, they don't have to talk to you if you don't have a subpoena." Sgt. Prater indicated that he no longer wished to speak with Mr. Dudani and gave Mr. Dudani his name and badge number. Mr. Dudani left the police station at approximately 3:00pm.

43.     While Mr. Dudani walked to his car on Ames Street NE, he called his investigative partner at PDS to explain what happened. As Mr. Dudani approached his car, Officers John Kellman and Frantz Fulcher, who were in a marked SUV, slowed their car and stopped next to Mr. Dudani's car, blocking it next to the curb. As the two officers got out of their car and approached Mr. Dudani, he told his investigative partner that the two new officers approached him. The officers asked whether a white car parked in front of Mr. Dudani's car was his. Mr. Dudani replied, "No, this one is," and pointed to his car. Mr. Dudani then called his supervising attorney at PDS, Jeffrey Stein.

44.     Mr. Dudani asked the two officers why they stopped him and one of the officers replied, "I don't know, we were just sent here."

45.     As several minutes passed, Mr. Dudani repeatedly asked the officers why they stopped him and the officers said, "We don't know." Mr. Dudani asked if he was free to leave and one of the officers replied, "No, no, no, just stay here and relax." Mr. Dudani asked the officer if the police were allowed to stop him when neither the officers nor Mr. Dudani knew why the officers stopped him. The officer replied, "Yes, you are being detained right now." Mr. Dudani was on the phone with PDS during this exchange.

46.     The officers explained to Mr. Dudani that they had just started their shift and did not know why they were told to detain him. As the officers detained Mr. Dudani several police vehicles drove passed both to and from the station. The officers detaining Mr. Dudani told some of the other officers that they need to get into contact with MPO Burgeson. The detaining officers asked Mr. Dudani about what had happened earlier at

6D. Although Mr. Dudani did not respond initially, after speaking with a PDS attorney, Mr. Dudani told the detaining officers what he told the officers earlier.

47.     Mr. Dudani asked the officers if he could put his backpack in his car and one of the officers said, "Yes." Mr. Dudani put his PDS case files and backpack into the trunk of his car.

48.     One of the officers moved the police vehicle out of the street and next to the curb to make room for a passing fire truck.

49.     While still on the phone with PDS, Mr. Dudani asked the officers if he could step aside momentarily. One officer replied, "No, we need you to stay in the vicinity," and pointed to the area in front of Mr. Dudani's car.  After a few minutes the officers asked Mr. Dudani to stop pacing.

50.     Eventually, one of the officers told Mr. Dudani that a detective was coming to interview him. Mr. Dudani asked the officer how long it would take for the detective to arrive, and the officer replied, "He's on his way." The officer pointed to the police station and said, "It's right there, five to ten minutes."

51.     At approximately 3:40 pm, an unmarked car with two detectives arrived. The detectives introduced themselves as Detective White and Detective William F. Covington.

52.     Mr. Dudani asked the detectives if he could stay on the phone with PDS during the interview and Detective White said, "No." Detective White asked for Mr. Dudani's ID. Mr. Dudani asked, "Which one, my work ID or my license?" Detective Covington replied, "Whichever is more convenient." Mr. Dudani handed Detective Covington his PDS ID. Detective White asked Mr. Dudani how long he had been working for PDS, and Mr. Dudani replied, "About six weeks, I'm a summer intern." Detective White asked Mr. Dudani, "Who is your supervisor?" When Mr. Dudani replied,

13

"Jeffrey Stein," Detective White asked, "Is that the lawyer you work for?" Mr. Dudani said, "Exactly, he's a staff attorney at PDS."

53.     One of the detaining officers asked Mr. Dudani what type of case he was working on. One of the officers asked Mr. Dudani how PDS investigators normally enter police stations. Mr. Dudani replied, "Through the front," and explained that an officer had suggested the back exit.

54.     Early in the interview, Jeffrey Stein and Mr. Dudani's investigative partner arrived in an SUV and parked a few cars behind Mr. Dudani's car. They exited the car, and Mr. Stein explained that he was Mr. Dudani's supervising attorney at PDS.

55.     Mr. Stein described the situation as a miscommunication. An officer said that Mr. Dudani was on private property and Detective White said he was "trying to piece together what happened." Detective White told Mr. Stein, "He was in the parking lot, which shouldn't be open but is." Detective White asked Mr. Stein what PDS protocol is for approaching officers for interviews. Mr. Stein explained that it depends on the situation and on factors such as whether or not an investigator can make an appointment. Detective Covington asked Mr. Stein how long he has been working at PDS, and after Mr. Stein responded, Detective Covington said, "A year is long enough to know you should use the front door." The detectives asked Mr. Dudani if the officers that detained him knew who he was, and Mr. Dudani responded, "Yes."

56.     Detective White asked Mr. Dudani to tell him what happened. At one point when Mr. Dudani was relating his story, Detective White stopped him and asked Mr. Dudani if he knew what the officers he wanted to interview looked like. Mr. Dudani said, "A little, yes." Detective White asked Mr. Dudani if he ever saw any of the officers and Mr. Dudani replied, "No." Detective White asked Mr. Dudani how he knew what the officers looked like and Mr. Dudani replied, "I've been investigating the case." Detective

White again asked Mr. Dudani how he knew what the officers looked like. Mr. Stein then explained that Mr. Dudani knew what the officers looked like through his investigation.

57.    Detective White asked Mr. Dudani, "Is there anything in your car that I should know about?" Mr. Dudani said, "No. There's the backpack that was searched earlier." Detective White asked me, "Would you have any problems with us searching your car?" Mr. Dudani began to refuse the search, but stopped and waited until Mr. Stein was off the phone with PDS General Counsel. Mr. Stein told Mr. Dudani, "I can't give you legal advice. It's entirely up to you." Detective White asked, "So do you have any objections to us searching your car?" Mr. Dudani asked, "Can I refuse the search?" Detective White said, "Yes." Mr. Dudani said, "Then I'd rather not." Detective White asked, "So your answer is no?" Mr. Dudani again said, "Yes." Detective White asked, "Is there any particular reason you're saying 'no'?" Mr. Dudani again waited for Mr. Stein to finish a phone call. Mr. Stein reiterated that it was Mr. Dudani's decision whether to answer the officer's questions or allow the officer to search Mr. Dudani's car.

58.    Detective White began using his radio and walking in the direction of the police station.

59.    At approximately 4:15 pm, Detective White returned and told Mr. Dudani that he was free to go.

### The Investigation

60.    MPD conducted an internal investigation of the incident.

61.    The investigation resulted in a 45-page memorandum relating the outcome of the investigation. The investigation was conducted by Lt. Gary L. Fitzgerald, who works at the Sixth District, the station where Mr. Dudani was detained twice on August 7.

62.    The report summarizes the incident, summarizes the witness statements, and relates its conclusion and findings. The rest of the document is comprised of sixteen attachments, including the statements of MPD employees, the PD-251 incident report, and a memo Mr. Dudani wrote for his supervising attorney at PDS.

63.    The thrust of the report is that Mr. Dudani appeared to be a terrorist who intended to attack the police station by detonating explosives hidden in his backpack at the gas pumps in the station's parking lot.

64.    MPD's report is both internally inconsistent and inconsistent with the facts.

65.    The report states that when an officer told Mr. Dudani that he would tell Mr. Dudani where he could find the officers, Mr. Dudani "began to walk away". Mr. Dudani did not depart in such an abrupt fashion. Rather, Mr. Dudani explained to the officers that he was investigating an incident. When it was clear that they were still not inclined to help, Mr. Dudani thanked them and then walked away.

66.    The report states that when Mr. Dudani walked away, suspicions were further raised. This remark is incomplete and misleading in light of the officers' verbal reaction. When Mr. Dudani walked away, the officers loudly joked about how he was attempting to serve subpoenas.

67.    The report states that another officer saw Mr. Dudani near the gas pumps. The report's summary of Attachment 2 states that Mr. Dudani was near the gas pumps. Mr. Dudani was never near the gas pumps.

68.    The report's summary of Attachment 2 states that Mr. Dudani's "proximity to the fuel depot combined with the carrying of a back pack, immediately raised [MPO Burgeson's] suspicion." This statement  contradicts the remarks MPO Burgeson made to Mr. Dudani at the time of the incident as well as the night after the

incident. Both times MPO Burgeson specifically stated that he did not think any action was necessary until someone else told him that protocol required Mr. Dudani to produce his identification.  MPO Burgeson's description of his motivation for stopping Mr. Dudani did not include suspicions of Mr. Dudani's location or backpack.

69.     The report's summary of Attachment 2 states that MPO Burgeson "approached Mr. Dudani and asked if he could help with something," and did so "[i]n response" to his suspicions about Mr. Dudani. This is false. MPO Burgeson and the other officers were stationary, standing by the back door. Mr. Dudani came to the officers and initiated conversation. None of the officers moved until Mr. Dudani walked away. More importantly, it is implausible that MPO Burgeson harbored the suspicion that Mr. Dudani planned to blow up the gas pumps prior to their conversation. After the exchange, the officers made jokes about Mr. Dudani being a process server.

70.     The report's summary of Attachment 2 again mischaracterizes Mr. Dudani's departure from the conversation as sudden and strange.

71.     The report's summary of Attachment 2 states that Mr. Dudani "eventually produced a California driver's license". The inclusion of the word "eventually" is misleading. Whenever an officer asked Mr. Dudani for identification, Mr. Dudani asked whether the officer wanted his driver's license or work ID, and complied immediately once an officer answered.

72.     The report's summary of Attachment 2 states that Mr. Dudani was unable to "produce work identification". This is not true. Mr. Dudani offered to produce, and did produce, his work ID, more than once—whenever he was asked. Sgt. Prater thought Mr. Dudani's work ID appeared authentic while one of the detectives interviewing Mr. Dudani thought his ID appeared fraudulent , contradicting the claim that it was altogether absent.

73.    The report's summary of Attachment 2 states that MPO Burgeson does not recall any officer taking photographs of Mr. Dudani and does not recall speaking to Mr. Dudani about this matter. MPO Burgeson told Mr. Dudani twice that an officer took photos for the incident report.

74.    The officer whose statement is the basis for Attachment 5 claims his impetus for a call to a federal colleague was that Mr. Dudani would not state why he was at the police station to another officer. This exchange never happened.

75.    The report's summary of Attachment 5 claims that an officer who witnessed the entirety of the first stop, "cleared the scene after approximately five minutes". Mr. Dudani entered the parking lot at about 2:30 and left the police station at about 3:00. Mr. Dudani's first stop lasted for the better part of the half hour.

76.    The report's summary of Attachment 7 states that the detectives arrived to interview Mr. Dudani 15 minutes after he was stopped for the second time. This is incorrect, as the officers stopped Mr. Dudani at his car right after 3:00, and the detectives arrived at 3:40.

77.    The report's summary of Attachments 7 and 8 states that Mr. Dudani's employer (Mr. Jeffrey Stein) told the detectives Mr. Dudani was not "properly trained" in interviewing police officers. Mr. Stein did not say this.

78.    The report's summary of Attachments 7 and 8 states that the detectives' "interview concluded after approximately fifteen minutes and Mr. Dudani was released". This is incorrect. The interview began around 3:40 and ended at about 4:15.

79.    The report's summary of Attachment 8 states, "While awaiting the arrival of detectives, Mr. Dudani's bosses arrived at the scene". It then states, "While that interview was taking place, two other supervisors from Mr. Dudani's place of work arrived". Mr. Dudani's supervisors did not arrive before the detectives. Additionally, only

two people from PDS came to the scene, not four, and only one was Mr. Dudani's supervisor.

80.     The report's summary of Attachment 9 states that Mr. Dudani was "standing near the fuel pumps", but Mr. Dudani was never near the gas pumps.

81.     The report's summary of Attachment 10 states that the officer "received information indicating that this same individual had been seen walking on the property and in the station on previous days". The PD-251 more specifically claims that Mr. Dudani was in the parking lot on previous days. Mr. Dudani previously visited the police station, but never inside the parking lot, or anywhere other than the station's lobby.

82.     The report's summary of Attachment 10 claims that Mr. Dudani told the detective that he was at the police station to serve subpoenas. This claim is false; Mr. Dudani said he was there to interview officers for a PDS investigation.

83.     The report's summary of Attachment 10 states, "Mr. Dudani relayed that he approached an unidentified officer who advised that the officers he was looking for would be walking out the back door of the station. That led him to the rear lot of the Sixth District". These sentences, and the corresponding ones in Attachment 10, misleadingly omit that the officer suggested that Mr. Dudani walk to the back exit.

84.     The report's summary of Attachment 10 characterizes an exchange between the detective and Mr. Dudani as follows: "When [the detective] asked if he knew what the officers looked like and how he planned to identify the officers, Mr. Dudani could give no clear answer". This is a misleading summary. Mr. Dudani answered the question and when the detective did not understand Mr. Dudani's answer, Mr. Stein attempted to clarify the answer; the detective then moved on.

85.     The report's summary of Attachment 11 states that Mr. Dudani "was unable to answer specific questions about his current address or the name of his

19

supervisor". Both of these claims are false, as Mr. Dudani provided both of these pieces of information whenever asked.

86.     The report's summary of Attachment 11 states, "An individual finally showed up indicating that he was Mr. Dudani's supervisor. It was at this point that Mr. Dudani advised that he was at the Sixth District attempting to serve subpoenas to sworn members". This last sentence is incorrect in two ways.  First, Mr. Dudani explained why he was at the Sixth District numerous times before Mr. Stein's arrival. Second, Mr. Dudani was not there to serve subpoenas and never told any officer that he was there to serve subpoenas.

87.     The report's summary of Attachment 13 states that Mr. Dudani "was seen wandering around the gas pump area and was told to report to the station lobby". Both clauses are incorrect.  Mr. Dudani was not "told" to "report to" the station lobby and he was not "wandering around the gas pump area."

88.     The "Physical Evidence Section" of the report states, "Attempts were made to include the video footage from the security cameras recording activity on the Sixth District's rear parking lot." However, Mr. Sean MacCarthy of Facilities Management informed Mr. Dudani that the video was no longer available (Attachment 16)". Attachment 16 consists of  email correspondence between Officer Fitzgerald and Mr. MacCarthy on Oct. 26 asking for the footage. Officer Fitzgerald indicated his belief that the video was likely deleted already. Mr. MacCarthy replied on Oct. 28 that the footage was already deleted.

89.     PDS had subpoenaed the video footage on August 8th. Additionally, PDS requested and received a court order for preservation of the footage.


**Destruction of the Videos**

90.     The District of Columbia, through one or more of its agents, negligently or recklessly caused the destruction of a video of the incident.  The deletion of the video was done in violation of an order from a Superior Court judge presiding over the case which Mr. Dudani was investigating for PDS.

### Training, Supervision, and Discipline of MPD Members

91.     The illegal actions of MPD members were the result of inadequate training, discipline, and supervision, and/or pursuant to an unconstitutional policy, custom, or practice.

92.     Specifically, MPD fails to train its members that actual or perceived race, ethnicity, and religion should not be taken into account in probable cause or reasonable suspicion analysis except as a specific description or tip from an informant.

93.     Further, MPD fails to supervise and discipline its members who engage in profiling of individuals based on their race, ethnicity, or religion, thereby encouraging a climate that tolerates and encourages this improper behavior.

94.     For example, no MPD member has ever been disciplined for engaging in profiling of an individual based on their actual or perceived race, ethnicity, or religion despite its members engaging in such improper behavior as selective enforcement of the criminal laws and creation of Suspicious Activity Reports (SARS) based on inappropriate criteria.

95.     Chief Lanier, the final decisionmaker for the District of Columbia, is or should be aware of these problems, because nonprofit organizations have issued reports on racial profiling by MPD, and she receives emailed copies of SARS reports through the computerized iWatch and TrapWire systems.

96.     As a result of the inadequate training, supervision, and discipline of MPD members, individuals such as Mr. Dudani suffer from illegal searches and/or seizures.

### Injuries suffered by Mr. Dudani

97.     Mr. Dudani suffered injuries from the MPD members' actions including, but not limited to, loss of liberty, invasion of his privacy, deprivation of due process, damage to his reputation, emotional distress, embarrassment, anxiety, mental anguish, deprivation of access to evidence, inconvenience, invasion of his bodily integrity, and dispossession of his backpack.

### Notice of Claim

98.     The appropriate and required notice of Plaintiff's intent to sue the District was made by hand-delivering a copy of Plaintiff's claims to the Mayor's designee, the Office of Risk Management, on February 5, 2014.

### COUNT I:
### ASSAULT AND BATTERY
(MPO Burgeson, District of Columbia)

99.     This Count realleges and incorporates by reference each of the preceding paragraphs.

100.    MPO Burgeson did intentionally and unlawfully place Mr. Dudani in fear of being touched without his consent.

101.    MPO Burgeson did intentionally and unlawfully touch Mr. Dudani without his consent.

102.    MPO Burgeson's actions were not reasonably necessary because there was no legitimate law enforcement reason to detain or otherwise touch Mr. Dudani.

103.    The District of Columbia is liable for MPO Burgeson's assault and battery of Mr. Dudani under the doctrine of *respondeat superior* because MPO Burgeson was acting within the scope of his duties as an officer for the MPD.


## COUNT II:
## DEFAMATION
(MPO Burgeson, Ofc. Smith, Lt. Gary Fitzgerald, District of Columbia)

104.    This Count realleges and incorporates by reference each of the preceding paragraphs.

105.    MPO Burgeson made knowingly false statements about Mr. Dudani which were published in the PD-251 suspicious activity report.

106.    The PD-251 is a publicly available document.

107.    Defendant Ofc. Smith wrote the PD-251 suspicious activity report. Ofc. Smith published the report with reckless disregard for the truth.

108.    The statements in the PD-251 constitute defamation *per se*, as they falsely allege that Mr. Dudani engaged in unprofessional and/or criminal activities.

109.    MPD officers made knowingly false statements about Mr. Dudani which were published in the internal investigative report. Defendant Lt. Fitzgerald wrote the internal investigative report. Lt. Fitzgerald published the report with reckless disregard for the truth.

110.    The statements in the internal report constitute defamation *per se*, as they falsely allege that Mr. Dudani engaged in unprofessional and/or criminal activities.

111.    The District of Columbia is liable for MPD members' defamatory statements about Mr. Dudani under the doctrine of *respondeat superior* because the MPD officers were acting within the scope of their duties as officers of the MPD.

## COUNT III:
## FALSE ARREST / FALSE IMPRISONMENT
(MPO Burgeson, John Doe 2, Ofc. Kellman, Ofc. Fulcher, District of Columbia)

112.    This Count realleges and incorporates by reference each of the preceding paragraphs.

113.    MPO Burgeson unlawfully detained Mr. Dudani without his consent and for no legitimate law enforcement purpose.

114.    John Doe 2 ordered a second, unlawful detention of Mr. Dudani.

115.    Acting on orders from John Doe 2, Ofc. Kellman and Ofc. Fulcher unlawfully detained Mr. Dudani again without his consent and for no legitimate law enforcement purpose.

116.    The District of Columbia is liable for these officers' false arrests and false imprisonments of Mr. Dudani under the doctrine of *respondeat superior* because they were acting within the scope of their duties as officers for the MPD.

## COUNT IV:
## INTRUSION UPON SECLUSION
(John Doe 1, District of Columbia)

117.    This Count realleges and incorporates by reference each of the preceding paragraphs.

118.    In searching Mr. Dudani's backpack, John Doe 1 violated Mr. Dudani's privacy and committed the tort of intrusion upon seclusion.

119.    It would be highly offensive to an ordinary, reasonable person to have his or her backpack searched under the circumstances of this case, in particular because

sensitive work-related documents, including potentially attorney-client privileged material, was contained on a notepad inside the backpack.

120.    The District of Columbia is liable for John Doe 1's invasion of Mr. Dudani's privacy under the doctrine of *respondeat superior* because MPO Burgeson was acting within the scope of his duties as an officer for the MPD.

## COUNT V:
## CONVERSION
(John Doe 1, District of Columbia)

121.    This Count realleges and incorporates by reference each of the preceding paragraphs.

122.    In seizing and searching Mr. Dudani's backpack, John Doe 1 unlawfully exercised ownership, dominion, and control over Mr. Dudani's property in denial or repudiation of his right to such property.

123.    The District of Columbia is liable for John Doe 1's conversion of Mr. Dudani's backpack and its contents under the doctrine of *respondeat superior* because John Doe 1 was acting within the scope of his duties as an officer for the MPD.

## COUNT VI:
## NEGLIGENT SPOLIATION OF EVIDENCE
(District of Columbia)

124.    This Count realleges and incorporates by reference each of the preceding paragraphs.

125.    Acting on behalf of the District of Columbia, an unknown D.C. employee negligently or recklessly, through his or her actions or omissions, caused the destruction of a Sixth District surveillance video of the incident at issue in this case.

126.    The District of Columbia had a duty to preserve the surveillance video by statute, by court order, and by virtue of the special relationship of the parties.

127.    The destruction of the surveillance video has significantly impaired Mr. Dudani in pursuing the underlying claims in this case.

128.    There is a proximate relationship between Mr. Dudani's ability to succeed on his underlying claims and the unavailability of the destroyed evidence.

129.    Mr. Dudani's underlying claims would enjoy a significant possibility of success if the spoliated evidence were still in existence.

130.    The District of Columbia is liable for the unknown D.C. employee's negligent spoliation of evidence under the doctrine of *respondeat superior* because the unknown employee was acting within the scope of his or her duties as a District employee.

COUNT VII:
FOURTH AMENDMENT (42 U.S.C. § 1983)
(MPO Burgeson, John Doe 1, John Doe 2, Ofc. Kellman, Ofc. Fulcher, Det. Covington, Det. White)

131.    This Count realleges and incorporates by reference each of the preceding paragraphs.

132.    MPO Burgeson unconstitutionally seized Mr. Dudani by detaining him without reasonable suspicion.

133.    MPO Burgeson used excessive force against Mr. Dudani.

134.    John Doe 1 unconstitutionally searched Mr. Dudani's backpack without probable cause, consent, or other legal justification.

135.    John Doe 2 ordered a second, unlawful detention of Mr. Dudani.

136.    Acting on orders from John Doe 2, Ofc. Kellman and Ofc. Fulcher unlawfully detained Mr. Dudani again without his consent and for no legitimate law enforcement purpose.

COUNT VIII:
FOURTH AMENDMENT (42 U.S.C. § 1983)
(District of Columbia)

137.    This Count realleges and incorporates by reference each of the preceding paragraphs.

138.    The District of Columbia maintains a policy, custom, or practice of using a standard for determining when to search an individual's personal property that is less than probable cause.

139.    Specifically, the policy, custom, or practice of the District of Columbia is to authorize MPD members to search an individual's personal property based on the member's "prevailing sense" that the individual "could have possibly been involved in some sort of terrorist activity." As evidence that it is the policy, custom, or practice of MPD to use this standard, it is noted on page 13 of the 6D PSSSB report into the incident involving Mr. Dudani that use of such standard is "no violation of Department policy." As further evidence that this is the standard used by MPD, the Sixth District Commanding Officer and a Sixth District Administrative Captain signed the report, indicating their concurrence with its contents, including the statement describing the use of the "some sort of terrorist activity" standard as not being a violation of MPD policy.

140.    This official policy, custom, or practice was the moving force behind MPO Burgeson's search of Mr. Dudani's backpack without probable cause.

141.    In unconstitutionally searching Mr. Dudani's backpack, John Doe 1 was acting pursuant to this official policy, custom, or practice.

142.    The District of Columbia maintains a policy, custom, or practice of failing to adequately train, supervise, and discipline MPD members with regard to the use of actual or perceived race, religion, and ethnicity in the probable cause and reasonable suspicion analysis.

143.    This official policy, custom, or practice was the moving force behind the MPD members' unconstitutional seizure of Mr. Dudani and unconstitutional search of his backpack.

COUNT IX:
VIOLATION OF 42 U.S.C. § 1981
(District of Columbia)

144.    This Count realleges and incorporates by reference each of the preceding paragraphs.

145.    The District of Columbia, by and through its agents and employees, unconstitutionally impaired Mr. Dudani's right to the full and equal benefit of the laws enjoyed by white citizens by detaining him without reasonable suspicion because he is non-white.

146.    The District of Columbia, by and through its agents and employees, unconstitutionally impaired Mr. Dudani's right to the full and equal benefit of the laws enjoyed by white citizens by searching his backpack without probable cause because he is non-white.

147.    The District of Columbia is liable for the acts of its employees and agents in violation of 42 USC § 1981 under the doctrine of *respondeat superior*.

COUNT X:
VIOLATION OF TITLE VI
(District of Columbia)

148.    This Count realleges and incorporates by reference each of the preceding paragraphs.

149.    The District of Columbia maintains a policy, custom, or practice of failing to adequately train, supervise, and discipline MPD members with regard to the use of race and ethnicity in the probable cause and reasonable suspicion analysis.

150.    This official policy, custom, or practice was the moving force behind the MPD members' unconstitutional seizure of Mr. Dudani and unconstitutional search of his backpack.

151.    This official policy, custom, or practice has a disparate impact on non-white individuals, in particular individuals who are or are perceived to be of Middle Eastern descent.

152.    The District of Columbia's Metropolitan Police Department receives federal funds and therefore must comply with Title VI.

153.    The District of Columbia's Metropolitan Police Department receives assistance from the Department of Justice and therefore must comply with the agency's regulations implementing Title VI.

154.    The District of Columbia's official policy, custom, or practice is a violation of Title VI.

155.    Because of his appearance, Mr. Dudani is likely to be subjected to violation his rights whenever he is in the District of Columbia, as a result of the city's official policy, custom, or practice.

<u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury for all issues so triable.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Court:

(1) Declare Defendants' conduct to be unlawful;

(2) Award Plaintiff compensatory and punitive damages in an amount to be determined at trial, with the exception of punitive damages against the District of Columbia, which are not being sought;

(3) Grant Plaintiff an award of attorney fees and other litigation costs reasonably incurred in this action;

(4) Enjoin Defendant District of Columbia from committing further violations of Title VI;

(5) Enjoin Defendant District of Columbia from committing further violations of § 1983;

(6) Order Defendant District of Columbia to expunge, purge, and otherwise delete from its files any Suspicious Activity Reports (SARS) relating to the incident and to not rely on it for any future law enforcement purpose;

(7) Order Defendant District of Columbia to request the FBI or any other state, local, or federal agency which may possess a copy of any Suspicious Activity Reports (SARS) relating to the incident to expunge, purge, or otherwise delete from its files the report and to not rely on it in for any future law enforcement purpose;

(8) Grant Plaintiff such other and further relief which the Court deems proper.

Jeffrey L. Light
D.C. Bar #485360
1712 Eye St., NW
Suite 915
Washington, DC 20006
(202) 277-6213

*Counsel for Plaintiff*